IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ALFONSO PARRA and MARIA PARRA | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| vs. | § | CIVIL ACTION NO: 4:18-cv-268-P |
| | § | |
| INTERSTATE EXPRESS, INC. | § | |
| Defendant. | § | |

**PRETRIAL ORDER**

COMES NOW Plaintiffs Alfonso and Maria Parra ("Plaintiffs"), and Defendant Interstate Express, Inc. ("Defendant"), and file the following Pre-Trial Order:

**1.    Pending Jurisdictional Issues**

None.

**2.    Pending Motions**

a.    Defendants Motion for Continuance.  On April 1, 2020 Defendant filed its motion for continuance asking for a six-month continuance in light of the current COVID-19 pandemic. Plaintiffs opposed the Continuance and requested the Court try the case Nonjury.  Defendant opposes a non-jury trial.

**3.    Plaintiff's Claims**

On February 2, 2016, Douglas, while working for Interstate and/or All Ways, severely injured Plaintiff Alfonso Parra by negligently failing to yield the right of way and directly pulling the big rig / tractor-trailer he was operating into oncoming traffic and striking Alfonso Parra's vehicle, with sufficient force to cause his car to flip over, causing him severe and extreme injuries, destroying his vehicle and its contents.  Interstate and All Ways owned and controlled the Volvo tractor and Great Dane trailer driven and used by Douglas in injuring the Plaintiff Alfonso Parra

and causing damages to Plaintiffs. Douglas is liable for the injuries and damages caused by him during the use of the Volvo tractor and Great Dane trailer owned by Interstate and All Ways.

Alfonso Parra was travelling south on US Highway 81 when Douglas negligently pulled the big rig / tractor-trailer he was driving out and into Plaintiff, violently striking Plaintiffs' vehicle causing it to roll-over. Douglas, while in the course and scope of his employment as a driver for Interstate and/or All Ways, failed to yield to oncoming traffic when he pulled out onto the roadway, striking Alfonso Parra's vehicle and causing Mr. Parra's vehicle to roll-over at high speed because of the impact which caused severe personal injuries and nearly killing him. *See* Appendix to Plaintiffs' First Amended Complaint at Tab B – APP 0003 – APP 0004 for pictures of the remnants of Mr. Parra's vehicle after being hit by Douglas, demonstrating some of the extent and severity of the property damage caused by Defendants. The roof of Alfonso Parra's vehicle cab was crushed down to the seat level as the result of the impact and roll over and was a total loss, which resulted in additional damage to his personal property and tools, totaling in value more than $10,000.00.

Distracted and otherwise failing to stop, Douglas, while in the scope of his employment with Interstate and/or All Ways, caused severe property damage, and severe bodily injury to Alfonso Parra. Alfonso Parra suffered a Traumatic Brain Injury, permanent bodily injuries which required surgery and screw implants to repair his shoulder injury that occurred when he was struck by the truck owned / operated by Defendants. *See* Appendix to Plaintiffs' First Amended Complaint at Tab C – APP 0005 – APP 0007 for pictures reflecting some of Alfonso Parra's injuries. The severe bodily injuries suffered by Alfonso Parra, included a gash to the head with resulting stitches, concussion / closed head injury, and a shoulder separation/dislocation and tearing of the shoulder muscles and tendons, along with severe bruising, permanent disability, and

scarring. Ultimately, Alfonso Parra required surgery and implant intervention consisting of arm bone screw implants and internal stitching of his shoulder muscles and tendons. Maria Parra suffered a loss of consortium and household services because of the injuries sustained by her husband Alfonso Parra caused by the negligent / grossly negligent actions of Defendants.

On February 2, 2016, Douglas, while working for Interstate and/or All Ways, severely injured Plaintiff Alfonso Parra by negligently failing to yield the right of way and directly pulling a big rig / tractor-trailer out into oncoming traffic and striking Alfonso Parra's vehicle, with sufficient force to cause his car to flip over, causing him severe and extreme injuries, destroying his vehicle and its contents. Interstate and All Ways owned and controlled the Volvo tractor and Great Dane trailer driven and used by Douglas in injuring the Plaintiffs. Douglas is liable for the injuries caused by him during the use of the Volvo tractor and Great Dane trailer owned by Interstate and All Ways.

Alfonso Parra was travelling south on US Highway 81 when Douglas negligently pulled the big rig / tractor-trailer he was driving out and into Plaintiff, violently striking Plaintiffs' vehicle causing it to roll-over. Douglas, while in the course and scope of his employment as a driver for Interstate and/or All Ways, failed to yield to oncoming traffic when he pulled out onto the roadway, striking Alfonso Parra's vehicle and causing Mr. Parra's vehicle to roll-over at high speed because of the impact which caused severe personal injury and nearly killing him. *See* Appendix to Plaintiffs' First Amended Complaint at Tab B – APP 0003 – APP 0004 for pictures of the remnants of Mr. Parra's vehicle after being hit by Douglas, demonstrating some of the extent and severity of the property damage caused by Defendants. The roof of Alfonso Parra's vehicle cab was crushed down to the seat level as the result of the impact and roll over and was a total loss, which resulted in additional damage to his personal property and tools, totaling in value more than

$10,000.00.

Distracted and otherwise failing to stop, Douglas, while in the scope of his employment with Interstate and/or All Ways, caused severe property damage, and severe bodily injury to Alfonso Parra. Alfonso Parra suffered permanent bodily injuries, surgery and screw implants to repair his shoulder injury that occurred when he was struck by the truck owned / operated by Defendants. *See* Appendix to Plaintiffs' First Amended Complaint at Tab C – APP 0005 – APP 0007 for pictures reflecting some of Alfonso Parra's injuries. The severe bodily injuries suffered by Alfonso Parra, included a gash to the head with resulting stitches, concussion / closed head injury, and a shoulder separation/dislocation and tearing of the shoulder muscles and tendons, along with severe bruising, permanent disability, and scarring. Ultimately, Alfonso Parra required surgery and implant intervention consisting of arm bone screw implants and internal stitching of his shoulder muscles and tendons. Maria Parra suffered a loss of consortium and household services because of the injuries sustained by her husband Alfonso Parra caused by the negligent / grossly negligent actions of Defendants.

**4.      Defendant Interstate Express, Inc.'s Defenses**

Interstate Express, including its agents and/or employees, deny that it was in any way negligent, and deny that Plaintiffs can meet their burden of proof as to their liability and damages claims by a preponderance of the credible evidence, and further deny that Plaintiffs suffered any recoverable damages. Interstate further raises all of those defenses and/or affirmative defenses raised in its First Amended Original Answer to Plaintiffs' First Amended Complaint (Doc. No. 37), including but not limited to comparative negligence, contributory negligence, failure to mitigate damages, pre-existing medical conditions, degeneration and naturally occurring diseases of life, prior and subsequent injuries, unavoidable accident and sudden emergency. Interstate

further pleads all applicable damages caps and limitations raised in its First Amended Original Answer to Plaintiffs' First Amended Complaint, including but not limited to TEX. CIV. PRAC. & REM. CODE §§ 18.091, 41.001, 41.003, 41.004, 41.006, 41.007, 41.008, 41.009, 41.010, 41.0105, 41.011, 41.012, 41.013 and 41.014.  and TEX. FIN. CODE § 304.101 *et seq.*

Interstate further states that it intends to re-assert those defenses raised in its Motion for Partial Summary Judgment and supporting briefs (Doc. Nos. 68, 69 & 86) at the directed verdict stage.  In particular, Interstate contends that at the close of Plaintiff's case, the evidence will not meet Plaintiffs' burden to prove their claims of negligent entrustment, negligent supervision or control, or any gross negligence against Interstate, and that Plaintiffs should not be allowed to submit jury questions regarding these liability claims, and that Interstate is entitled to judgment as a matter of law.

**5.      Claims for Other Parties**

None.

**6.      Established Facts**

a.      A motor vehicle accident took place on or about February 2, 2016 on U.S. Highway 81 near Alvord, Texas.  Plaintiff Alfonso Parra was using his personal vehicle.  Roy Lester Douglas, deceased, was driving a tractor owned by Defendant Interstate Express, Inc. and hauling a trailer owned by Defendant All Ways Transport, Inc.

b.      Plaintiff Maria Parra is the spouse of Plaintiff Alfonso Parra.

c.      Roy Lester Douglas, deceased, had a valid California Commercial Driver's License at the time of the accident.

d.      Roy Lester Douglas, deceased, was an employee of Interstate at the time of the accident.  Mr. Douglas died from causes unrelated to this accident.

**7.      Issues to be Decided by the Jury.**

a.      Whether or not the February 2, 2016 motor vehicle accident was proximately caused by the negligence of any party or third person, if any, and the comparative fault of Plaintiffs, Interstate, and All Ways, and other persons, if any.

b.      Whether or not the February 2, 2016 motor vehicle accident was the result of a sudden emergency or was an unavoidable accident.

c.      The existence, extent and duration of any and all of the alleged injuries and damages claimed by Plaintiffs.

d.      Whether or not the Plaintiffs' alleged injuries and damages were proximately caused by the motor vehicle accident, or by other conditions, diseases and occurrences.

e.      Whether or not Plaintiffs injuries and/or damages, if any, were sufficiently proved by a preponderance of the credible evidence, including but not limited to all related factual issues concerning the defenses and affirmative defenses of Plaintiffs' failure to mitigate their damages, the existence, causes and effects of any and all pre-existing and/or subsequent medical conditions, prior and/or subsequent mental and/or physical conditions, prior and/or subsequent emotional and/or psychological conditions, prior and/or subsequent physical and/or mental degenerative conditions, prior and/or subsequent naturally occurring diseases of life, prior and/or subsequent accidents and/or injuries, and the amounts of medical and healthcare bills and expenses paid and incurred.

**8.      Contested Issues of Law**

a.      Whether Plaintiffs have sufficient evidence to present their claims of negligence, negligent entrustment, supervision, or control, or gross negligence against Interstate to the Court or jury.

**9.    Plaintiffs' Expert Witnesses**

a.    Officer Adam Lawson
Texas Department of Public Safety
P.O. Box 4087
Austin, TX 78773-0001
512-424-2000
*Investigating officer*

Officer Lawson will testify as to his observations at the scene of the accident, and his investigation of the scene of the accident, and of the drivers involved in the collision. Officer Lawson will further testify as to his accident report (previously produced) along with all the conclusions therein.

b.    Dr. Richard Fulbright Ph.D.
17000 Preston Road, Suite 350
Dallas, Texas 75248
972.250.1705
Expert Witness

Dr. Fulbright, Ph.D. performed a neuropsychological evaluation at the request of Plaintiffs' attorneys because the initial neuropsychological evaluation performed by Dr. Jones, could not be presented because of Dr. Jones sudden and unexpected death. It is anticipated that Dr. Fulbright, PhD. will give a summary of all medical examinations and findings that he relied upon in formulating his neuropsychological opinions and the importance of a detailed History in conducting his evaluation his Dr. Richard Fulbright like in all evaluations performed by him lays out certain criteria such as: IDENTIFYING INFORMATION: Afonso Parra is a 56-year-old married Latino male seen for a neuropsychological evaluation as an outpatient on referral from attorney Kelly Puls. Mr. Parra grew up in Mexico and completed the 10th grade. He has been in the United States since age 17 and became a naturalized US citizen at a later date. His work in construction throughout his career and has been employed in the same construction company for the last 16 years he lives in Fort Worth with his wife and one of their two daughters.

**REASON FOR EVALUATION:** Mr. Parra was involved in a motor vehicle accident in which his vehicle was struck by an 18-wheeler that pulled out in front of his vehicle from a side road. Mr. Parra's car spun several times and then rolled over several times. He reports continuing problems with cognitive and physical difficulties, and his family reports that he shows some significant changes in behavior as well. Mr. Parra is currently in litigation against the other driver. Mr. Parra's attorney had initially retained neuropsychologist William Bruce Jones, Ph.D. to evaluate him. Dr. Jones performed this evaluation on 1/14/2019. Unfortunately, Dr. Jones unexpectedly died in the fall of 2019. Consequently, Mr. Puls retained me to serve as an expert for the plaintiff in this case.

Mr. Parra had also undergone another independent neuropsychological evaluation by Bob Gant, Ph.D. at the request of defense counsel on 6/17/2019. Given the proximity in time of these two priors evaluations and given the late date of my engagement relative to disclosure deadlines, I opted to interview Mr. Parra and his family and perform some limited supplemental testing on 12/7/2019. Given the time constraints, the review of his medical history will be briefer than is customary for my reports. In addition, I have not received raw neuropsychological test data from Dr. Gant, and therefore, this report will necessarily be a preliminary report pending my review of those records.

**DECLARATIONS:** A forensic evaluation differs from a clinical evaluation in that there is no traditional doctor-patient relationship between the psychologist and person being evaluated. The purpose of the evaluation is to assist the retaining attorney and potentially the trier of fact in understanding the status of the individual for the purpose of litigation. Therefore, establishing a treatment relationship would create a potential conflict between the psychologist's roles as an objective evaluator versus advocate for the patient. Consequently, it is important that a retained

expert avoid the role of treater. This standard is mandated by the laws of the State of Texas (Texas Administrative Code) as well as the Code of Ethics of the American Psychological Association (2010), and it represents the official position of the National Academy of Neuropsychology (Bush, 2005).

Since Dr. Fulbright was retained as an expert by Mr. Parra's legal counsel. Dr. Fulbright's role was necessarily restricted to that of a forensic consultant rather than a treating doctor in this context. Mr. Parra was informed of these conditions and consented to the evaluation understanding these limitations.

Opinions reached in this report are based on direct interview and results of our neuropsychological evaluation, collateral interviews with family or significant others, and an extensive review of the evaluees' medical records. These opinions are based on current neuropsychological assessment techniques and research in the area of traumatic brain injury and other areas relevant to the case. Opinions are based upon reasonable neuropsychological probability and are subject to modification based on provision of additional information. It is anticipated that Dr. Richard Fulbright Ph.D. will testify about the Records Reviewed and Test Performed by him in performing his neuropsychological evaluation and will detail the HISTORY OF PRESENTING PROBLEM taken from Mr. Parra and the History as revealed in the records: It is further anticipated that Dr. Fulbright will testify the manner in which he performed the test who accompanied Mr. Parra at the time of testing and will testify Mr. Parra was accompanied to the evaluation by his wife, Maria Elena, and his older daughter, Guadalupe, who provided additional historical information in the interview and completed some observer-based behavioral rating scales regarding Mr. Parra.

Mr. Parra stated that on 2/2/2016, he was driving home to Fort Worth from a job in Wichita Falls on Highway 81 around dusk. He reported that he was driving down the right side of the two-lane southbound side of the highway at 70 to 75 mph (the local speed limit) when an 18-wheeler pulled out from a side road onto the highway to cross over to the northbound side of the highway. Mr. Parra stated that he tried to avoid colliding with the truck and veered to the left lane, but the semi nonetheless hit the side of his truck, throwing it into a spin. His truck subsequently rolled over side-over-side at least several times before stopping. Dr. Fulbright's' history revealed that Mr. Parra stated that he remembers the impact as well as his car spinning and initially rolling over. As he stated at the time of the accident, he does not know if he was rendered unconscious, but he did sustain a 7-cm laceration to the left frontal-occipital area of his head. Mr. Parra stated that his next memory was trying to get out of his pickup truck. He indicated his right shoulder was injured and his left arm was in severe pain. He reported that he could not unbuckle his seatbelt initially because of this. He does not remember whether his pickup truck came to rest on its top, side, or upright. He stated that he remembers being worried that the pickup truck would catch on fire while he was trapped in the car. With this in mind, he ultimately is able to crawl out the broken window of the cab of his pickup. He indicated that there were two bystanders at the scene and that the truck driver stayed alongside his truck without interacting with him. The Wise County EMS first received a dispatch call at 6:26 PM and contacted Mr. Parra at 6:41 PM. The police records indicate that they arrived at the scene at 6:33 PM. Mr. Parra did not provide much detail about the time the police and the paramedics arrived, raising some question about his mental status for the time between the accident and the arrival of the first responders.

c.      Plaintiffs reserves the right to call any of Plaintiff's treating medical providers.  Plaintiff's treating, referral, referring doctors and all medical providers, who will testify as to the care and

treatment provided to Plaintiff, their examination of Plaintiff, Plaintiff's prior medical history, and all other matters relevant to their diagnosis, care, and treatment of Plaintiff.

> 1.    Wise County EMS
>        Al l employees, agents, and
>        Custodians of Records
>        1101 Rose Ave.
>        Decatur, Texas 76234
>        940.627.2002

The Wise County EMS report indicates that they first evaluated Mr. Parra at 6:41 PM. They described him as being alert and oriented times four, with a Glasgow Coma Scale of 15. He described as being ambulatory on the side of the road. They described him as having bruising with deformity to his left shoulder with pain being present. Mr. Parra sustained a seven-centimeter laceration to the left top of his head. He stated that he got into the ambulance on his own. He was found to have initial blood pressure of 165/103, with a pulse rate of 90. His EKG was normal, and he was given fentanyl and ondansetron for pain and nausea. After he experienced a spike in his blood pressure en-route to Decatur, he was rerouted to Denton Regional Medical Center because of his injury having reached a higher level of acuity.

> 2.    Denton Regional Medical Center ER
>        Thomas Olmsted, DO
>        Maanasi Burak, M.D.
>        Anuparn Singhal, M.D.
>        Rebecca Maria Constantino, PA
>        All medical providers, employees,
>        agents, and custodians of records
>        3535 South I-35
>        Denton, Texas 76210

Mr. Parra wife's transported by ambulance to Denton Regional Medical Center emergency care. It was noted that his seat broke in his pickup truck as a result of the impact. He was noted to have blood pressure of 209/99 initially and 163/78 the time of his discharge at 10:43 PM. He was

described as having a seven-centimeter frontal scalp laceration. He was noted be oriented to person, place, and time with no focal neurological deficits. X-rays of his chest and shoulder revealed no acute fracture cardiopulmonary disease. A CT scan of the brain revealed no acute intracranial abnormality, although cortical calcification of the right parietal lobe sought reflect dystrophic calcification vs. sequelae of previous neurocysticercosis. He was diagnosed with an abdominal contusion, chest wall contusion, contusion of the shoulder, head injury, acute without loss of consciousness, left shoulder strain, and scalp laceration. He was discharged home at 10:31 PM with instructions to seek medical attention if his symptoms worsened and for suture removal in 10 days. He was advised that he should follow up with his physician if he developed post-concussion syndrome or sudden neurological changes.

> 3.      Haley Smith, NP
> Gregory C. Downing, M.D.
> Kathryn Schmidt, D.O.
> Marc L. Anduss, M.D.
> Amy Cosgrove, M.D.
> Andrew Ryan, M.D.
> Kenneth Wilks, D.O.
> Karen Gutierrez, LVN
> Lisa Weber, PA-C
> All medical providers, employees,
> agents, and custodians of records
> CareNow
> 7400 McCart Ave.
> Fort Worth, TX 76133
> 817-294-1651

Mr. Parra was seen at a CareNow clinic in Fort Worth for suture removal from his head laceration on 2/12/2016.

4.      Trinity Chiropractic of Burleson
        Chase Dyess, DC
        All medical providers, employees,
        agents, and custodians of records
        815 SW Alsbury, Ste. 3
        Burleson, TX 796028
        817-295-1999

Mr. Parra was seen by chiropractor Daniel C Dyess, DC focusing on his pain in his shoulder, neck, and ribs. Records indicate that he was seen from 2/4/2016 through 8/16/2016 for chiropractic care of the symptoms. There was no indication that symptoms of cognitive impairment or neurobehavioral changes were addressed, as the treatment appears to be primarily focused on treating his physical pain.

5.      Joe Etter, M.D.
        All medical providers, employees,
        agents, and custodians of records
        Old Town Medical
        312 E. Renfro St., Suite 101
        Burleson, TX 76028-3948
        817-295-3100

Mr. Parra consulted with Joe Etter, DO on 3/10/2016. Dr. Etter evaluated him and diagnosed him with a post-concussion syndrome, a disorder of the acromioclavicular joint, and traumatic rupture of rotator cuff.

He simply began working with nurse practitioner Gloria Gray, FNP for ongoing medical care. For follow-up of the injury-related symptoms. Ms. Gray reported that his symptoms had been persistent. She stated "CT head showed no concussion but will do plain XR of skull since [he is having symptoms]" which included left, shoulder, and chest pain. She also noted that he was complaining of dizziness and new-onset hypertension. No focal neurological deficits were noted on exam. She described him as being "oriented x 3 with no impairment of recent or remote memory, normal coordination, and upper and lower extremity deep function reflexes intact

bilaterally." It is unclear how she evaluated his memory functioning. Subsequent skull x-rays were negative for skull fracture, as would be expected in a concussion.

6.      Jonathan Conrad, PT
        All medical providers, employees,
        agents, and custodians of records
        Physical Therapy Dynamics
        1012 S. Crowley Rd., Ste C.
        Crowley, TX 76036
        817-297-9670

Mr. Parra underwent physical therapy with Jonathan Conrad, PT for treatment of his shoulder pain and diminished strength and range of motion. Treatment began on 4/8/2016, and he appears to have terminated therapy at the recommendation of his therapist on 6/15/2016. On 7/6/2017, Parra underwent an EMG/NCS study of his symptoms of weakness and numbness in his left arm by Omar Selod, DO, PA. The nerve conduction and EMG studies were both found to be normal bilaterally. Further orthopedic assessment follow-up is recommended.

7.      Bret Beavers, MD
        Richard Antwi-Boasisko, PT, DPT
        All medical providers, employees,
        agents, and custodians of records
        The Orthopedic & Sports Medicine Institute
        2901 Acme Brick Plaza
        Fort Worth, TX 76109
        817-529-1900

Mr. Parra consulted with orthopedic surgeon Bret Beavers, M.D. on 7/17/27. Dr. Beavers determined that he had left impingement syndrome of the shoulder as well as cervical spine symptoms suggestive of a degenerative disc at C6-C7. He recommended nonoperative treatment of his shoulder, but on 7/27/2017, he recommended that Mr. Parra undergo a left shoulder rotator cuff repair with subacromial decompression and limited glenohumeral joint debridement. He

underwent the surgery on 8/11/2017 and appears to have recovered well, although he did not achieve full functional recovery.

**NEUROPSYCHOLOGICAL EVALUATIONS:** Mr. Parra underwent two neuropsychological evaluations requested by both plaintiff and then defense counsel.

**William Bruce Jones, Ph.D. 1/16/2019:** Mr. Parra underwent a neuropsychological evaluation by William Bruce Jones, Ph.D. on 1/16/2019. Although defense counsel intimated that Dr. Jones did not administer Spanish-language testing, it should be noted that Dr. Jones in fact did understand the impact of language functioning and administered certain tests in Spanish as well as they could be done. It should be noted that simply translating a test into Spanish does not make it valid to administer to that individual in Spanish.

Mr. Parra performed variably on measures of visuospatial abilities, with mildly impaired abstract spatial reasoning and excellent nonverbal visual spatial problem-solving skills. On other measures of intellectual testing that did not involve language, Mr. Parra showed low average to borderline impaired visuomotor processing speed. Mental arithmetic skills were average.

Single-digit mathematic addition skills, as he performed well on a test requiring him to rapidly add numbers to the previous number presented.

Due to Spanish being his primary language, intellectual testing assessing verbal skills was not administered.

Memory testing revealed essentially normal performances on a word learning test that was apparently administered in Spanish.

Mr. Parra's basic cognitive flexibility was impaired on a measure of alternating attention.

He performed normally, however, on another measure of abstract reasoning.

Visual spatial skills were normal on a measure of memory for a complex visual design that Mr. Parra was allowed to copy initially. However, he had difficulty retaining this information after a delay.

Mr. Parra demonstrated difficulty on a measure of psychomotor problem-solving abilities required to place a series of blocks into a form board using each hand individually and then both hands together. His performance was unusually slow, suggesting some deficits in his higher-order organizational skills and motor functioning.

Mr. Parra demonstrated evidence of moderate depression and anxiety on self-report measures.

Mr. Parra performed normally on symptom validity testing, with no evidence suggesting insufficient effort or symptom amplification.

Dr. Jones interpreted his test results as indicating that Mr. Parra had in fact sustained neurocognitive impairment due to a traumatic brain injury. He recommended that Mr. Parra undergo cognitive rehabilitation therapy and individual psychotherapy as well as subsequent reevaluation of his functioning. **HISTORY OF PRESENTING PROBLEM:** Mr. Parra was accompanied to the evaluation by his wife, Maria Elena, and his older daughter, Guadalupe, who provided additional historical information in the interview and completed some observer-based behavioral rating scales regarding Mr. Parra.

Mr. Parra stated that on 2/2/2016, he was driving home to Fort Worth from a job in Wichita Falls on Highway 81 around dusk. He reported that he was driving down the right side of the two-lane southbound side of the highway at 70 to 75 mph (the local speed limit) when an 18-wheeler pulled out from a side road onto the highway to cross over to the northbound side of the highway. Mr. Parra stated that he tried to avoid colliding with the truck and veered to the left lane, but the

semi nonetheless hit the side of his truck, throwing it into a spin. His truck subsequently rolled over side-over-side at least several times before stopping.

Mr. Parra stated that he remembers the impact as well as his car spinning and initially rolling over. As he stated at the time of the accident, he does not know if he was rendered unconscious, but he did sustain a 7-cm laceration to the left frontal-occipital area of his head. Mr. Parra stated that his next memory was trying to get out of his pickup truck. He indicated his right shoulder was injured and his left arm was in severe pain. He reported that he could not unbuckle his seatbelt initially because of this. He does not remember whether his pickup truck came to rest on its top, side, or upright. He stated that he remembers being worried that the pickup truck would catch on fire while he was trapped in the car. With this in mind, he ultimately is able to crawl out the broken window of the cab of his pickup. He indicated that there were two bystanders at the scene and that the truck driver stayed alongside his truck without interacting with him. The Wise County EMS first received a dispatch call at 6:26 PM and made contact with Mr. Parra at 6:41 PM. The police records indicate that they arrived at the scene at 6:33 PM. Mr. Parra did not provide much detail about the time the police and the paramedics arrived, raising some question about his mental status for the time between the accident and the arrival of the first responders.

The Wise County EMS report indicates that they first evaluated Mr. Parra at 6:41 PM. They described him as being alert and oriented times four, with a Glasgow Coma Scale of 15. He described as being ambulatory on the side of the road. They described him as having bruising with deformity to his left shoulder with pain being present. Mr. Parra sustained a seven-centimeter laceration to the left top of his head. He stated that he got into the ambulance on his own. He was found to have initial blood pressure of 165/103, with a pulse rate of 90. His EKG was normal, and he was given fentanyl and ondansetron for pain and nausea. After he experienced a spike in his

blood pressure en route to Decatur, he was rerouted to Denton Regional Medical Center because of his injury having reached a higher level of acuity.

**Dr. Fulbright made the following CONCLUSIONS:**

1. Mr. Parra's clinical history is suggestive of a possible traumatic brain injury. He had alteration of consciousness caused by a significant physical force of not only the impact but the rotational forces to which his brain was subjected in the rollover accident. He clearly hit his head, sustaining a large laceration.

2. Mr. Parra's neuropsychological test results appeared most consistent with injury to the frontal regions of the brain. The frontal regions of the brain are primarily responsible for behavioral regulation, attention, and higher-order cognitive functioning. He showed deficits in his attention and certain aspects of higher order cognitive functioning that are inconsistent with his intellectual abilities as measured by Dr. Jones.

3. Mr. Parra's frontal lobe deficits are likely to affect him in day-to-day life I interfering with his reasoning, his attention, and his interpersonal functioning, his complaints of cognitive impairment and behavioral changes following the injury are consistent with injury to the frontal lobes of the brain.

4. Mr. Parra clearly appears to be demonstrating evidence of posttraumatic stress disorder that will require additional treatment.

5. I found no evidence of malingering or symptom amplification on testing, and his test results appear to be valid indicators of his cognitive and behavioral functioning.

6. Mr. Parra would benefit from neuropsychological intervention to help him understand better manage his cognitive deficits. In addition, his wife would also benefit from some conjoined therapy with him to better understand the nature of his problems and how they have

affected their relationship. He would also benefit from some pharmacologic intervention to address his concerns with attention and memory.

The above is contained in Dr. Fulbright's preliminary report which is incorporated herein as if set forth at length of the limited assessment and medical record review that Dr. Fulbright performed on Mr. Parra and. Dr. Fulbright has requesting additional information, specifically Dr. Gant's raw neuropsychological test data so that I Dr. Fulbright can more thoroughly assess his evaluation of Mr. Parra.

**Bob Gant, Ph.D. 6/17/2019:** Defense counsel retained a neuropsychologist Bob Gant, Ph.D. to perform a neuropsychological evaluation on Mr. Parra, and this was completed on 6/17/2019. Although Dr. Gant's raw neuropsychological test data was requested, it was not provided in time to review at the time of this report. Consequent, this report should be considered a preliminary assessment of Dr. Gant's opinions until the actual data on which he based his opinions can be reviewed.

Although Dr. Gant criticized Dr. Jones for performing insufficient review of medical records, Dr. Gant apparently performed only a very brief clinical interview with Mr. Parra. In his report, he composed about three pages of history based on Mr. Parra's medical records and about one paragraph if history based on direct interview of Mr. Parra. There is no indication he performed any collateral interview with Mr. Parra's wife or family members, which is important, since Mr. Parra does not appear to have full awareness of the extent of his cognitive and behavioral deficits. Consequently, interviewing only Mr. Parra is likely to produce an invalid portrayal of his cognitive and behavioral changes as they are expressed in day-to-day life.

Dr. Gant stated that Mr. Parra was evaluated in Spanish by a Spanish-speaking individual. However, he does not specify in his report that the tests administered were normed for Spanish

speakers. It is improper to simply translated test from English to Spanish and then use norms developed for English-speaking populations. Without reviewing the actual raw data, cannot answer questions about the validity of Dr. Gant's evaluation for his methodology.

Dr. Gant concluded based on his data that Mr. Parra's test results were invalid using the Meyers Neuropsychological Test Battery, the Word Memory Test (Unclear If This Was Administered in English or Spanish), and two other self-report symptom validity measures that were not specifically specified as being administered in Spanish using norms for Spanish-speaking individuals. Dr. Gant provided minimal information about Mr. Parra's test results other than to say that he performed reasonably well on the limited measures administered to him but incongruently performed poorly on symptom validity testing. This is a very atypical pattern that needs further investigation as to Dr. Gant's methodology, consideration of language factors, the appropriateness of the instruments used to reach this conclusion. I will be happy to provide additional opinions about Dr. Gant's evaluation once we have received actual raw data on which he based his opinions.

**Defendants neurological evaluation by Daragh Heitzman, M.D. 6/30/2019:** Mr. Parra saw neurologist Daragh Heitzman, M.D. at the request of Defense counsel for neurological evaluation at the request of defense counsel. Dr. Heitzman performed a clinical history and neurological evaluation as well as a review of Mr. Parra's medical records. The history he obtained was consistent with the clinical history that Mr. Parra provided B. He noted that Dr. Jones concluded that Mr. Parra had evidence of neuropsychological impairment consistent with a mild traumatic brain injury. However, he appears to have based his opinions on Dr. Gant's conclusion that Mr. Parra yielded invalid performances that Dr. Gant interpreted as "exaggerated willful impairment and decreased effort." Dr. Heitzman concluded that since Mr. Parra's cognitive deficits did not resolve within a few months, his symptoms were inconsistent with a traumatic

brain injury. He also concluded that his physical symptoms were inconsistent with the nature of his injury. He treated Mr. Parra's headaches to causes not related to the injury, since he did not believe that posttraumatic headaches should last more than a few months. He reaches the same conclusion regarding his cognitive impairment.

It is unclear whether Dr. Heitzman specified to Mr. Parra that he was performing an evaluation as an expert for the defense rather than a treating physician, since he made numerous clinical recommendations and stated that he spent about 45 minutes "counseling and coordinating care." Providing care of this nature would be considered inappropriate for an independent valuation in a forensic setting, since this blurs the boundaries between that of evaluator and treater.

**Bob Gant, Ph.D. 6/17/2019:** Defense counsel retained a neuropsychologist Bob Gant, Ph.D. to perform a neuropsychological evaluation on Mr. Parra, and this was completed on 6/17/2019. Although Dr. Gant's raw neuropsychological test data was requested, it was not provided in time to review at the time of this report. Consequent, this report should be considered a preliminary assessment of Dr. Gant's opinions until the actual data on which he based his opinions can be reviewed.

Although Dr. Gant criticized Dr. Jones for performing insufficient review of medical records, Dr. Gant apparently performed only a very brief clinical interview with Mr. Parra. In his report, he composed about three pages of history based on Mr. Parra's medical records and about one paragraph if history based on direct interview of Mr. Parra. There is no indication he performed any collateral interview with Mr. Parra's wife or family members, which is important, since Mr. Parra does not appear to have full awareness of the extent of his cognitive and behavioral deficits. Consequently, interviewing only Mr. Parra is likely to produce an invalid portrayal of his cognitive and behavioral changes as they are expressed in day-to-day life.

Dr. Gant stated that Mr. Parra was evaluated in Spanish by a Spanish-speaking individual. However, he does not specify in his report that the tests administered were normed for Spanish speakers. It is improper to simply translated test from English to Spanish and then use norms developed for English-speaking populations. Without reviewing the actual raw data, cannot answer questions about the validity of Dr. Gant's evaluation for his methodology.

Dr. Gant concluded based on his data that Mr. Parra's test results were invalid using the Meyers Neuropsychological Test Battery, the Word Memory Test (Unclear If This Was Administered in English or Spanish), and two other self-report symptom validity measures that were not specifically specified as being administered in Spanish using norms for Spanish-speaking individuals. Dr. Gant provided minimal information about Mr. Parra's test results other than to say that he performed reasonably well on the limited measures administered to him but incongruently performed poorly on symptom validity testing. This is a very atypical pattern that needs further investigation as to Dr. Gant's methodology, consideration of language factors, the appropriateness of the instruments used to reach this conclusion. I will be happy to provide additional opinions about Dr. Gant's evaluation once we have received actual raw data on which he based his opinions.

**Defendants neurological evaluation by Daragh Heitzman, M.D. 6/30/2019:** Mr. Parra saw neurologist Daragh Heitzman, M.D. for Defendants neurological evaluation at the request of defense counsel. Dr. Heitzman performed a clinical history and neurological evaluation as well as a review of Mr. Parra's medical records. The history he obtained was consistent with the clinical history that Mr. Parra provided B. He noted that Dr. Jones concluded that Mr. Parra had evidence of neuropsychological impairment consistent with a mild traumatic brain injury. However, he appears to have based his opinions on Dr. Gant's conclusion that Mr. Parra yielded invalid performances that Dr. Gant interpreted as "exaggerated willful impairment and decreased effort."

Dr. Heitzman concluded that since Mr. Parra's cognitive deficits did not resolve within a few months, his symptoms were inconsistent with a traumatic brain injury. He also concluded that his physical symptoms were inconsistent with the nature of his injury. He treated Mr. Parra's headaches to causes not related to the injury, since he did not believe that posttraumatic headaches should last more than a few months. He reaches the same conclusion regarding his cognitive impairment.

**10.     Interstate's Expert Witnesses**

a.     Daragh Heitzman, M.D.
       Texas Neurology, P.A.
       6301 Gaston Ave., Suite 100 West Tower
       Dallas, Texas 75214
       (214) 827-3610
       *Medical expert*

Dr. Heitzman will testify as to both his review of Plaintiff's medical records, any or all other records produced, including educational, medical, healthcare and employment records produced in this case, and as to his conference with Plaintiff and his family, and his physical examination of Plaintiff, Mr. Alfonso Parra. He will testify as to the details of his written report, and as to his observations, opinions, impressions and findings, and all of his opinions and testimony will be based upon his education, training, experience and based upon a reasonable medical/neurological probability. Dr. Heitzman's report reviewed Mr. Parra's medical records before his meeting and examination, and any records received after his examination of Plaintiff. Dr. Heitzman will testify that the emergency medical services (EMS) responders to this accident reported that Plaintiff had a very low Glasgow Coma Score of 15 and was AAA x4. The medical records revealed that Plaintiff had no loss of consciousness. He denied being confused in the recovery room, and a CT scan demonstrated no acute findings supporting any brain injuries. There was cortical calcification in the right parietal lobe likely representing dystrophic calcification

versus sequelae of previous neurocystercisosis.   There was also evidence of paranasal sinus disease.   Lab work showed a normal cbc and cmp.   Skull x-rays were performed that were unremarkable.   Plains x-rays of the cervical spine were unremarkable.   An MRI of the cervical spine was performed which showed degenerative changes at C5-6, but which was otherwise unremarkable.   Plaintiff has a history of a left choleosteoma that preceded the motor vehicle accident, along with an effusion on the right.   He had dizziness, vertigo, ear pain and hearing loss on the left.   Medicine had been prescribed and Plaintiff had been referred to an ear, nose and throat (ENT) specialist prior to the accident but refused to go.

Dr. Heitzman will testify as to Plaintiff's reported history, the details of his report and his physical examination.   He will testify that he diagnosed Plaintiff with a nonintractable episodic headache, unspecified headache type – R51. Dr. Heitzman will testify that these headaches appear to be tension headaches, and are not of the migraine type.   Based upon a reasonable medical probability, these headaches were more likely than not unrelated to the motor vehicle accident due to the fact that most such headaches resolve within a few months.   He will testify that it is unclear how much Plaintiff's sinus problems and left neck/shoulder pain are playing a role.

Dr. Heitzman will also testify as to his diagnosis of cognitive complaints – R41.9.  He will testify that most cognitive complaints resolve within months after a minor traumatic brain injury or concussion, and that a mini-mental status examination in his office was normal.  Dr. Heitzman will testify as to his review of and opinions concerning the neuropsychological reports, opinions and testimony of William Bruce Jones, Ph.D., Richard L. Fulbright, Ph.D., and Bob Gant, Ph.D. Dr. Heitzman will respond to the unfounded critical statements by Dr. Fulbright contained in his report.  Dr. Heitzman will testify that based upon of all records provided in this case, that he does

not believe that Plaintiff has a cognitive/brain related impairment as a consequence of his motor vehicle accident.

Dr. Heitzman will also testify that the calcification noted in the CT scan would not be related with Plaintiff's motor vehicle accident and likely reflects remote neurocystericosis, as Plaintiff denied any remote head injury or events. Further, the paranasal sinus disease was unrelated to the motor vehicle accident. Dr. Heitzman will testify that he recommends Plaintiff undergo a MRI for the brain to rule out neurocystercisosis.

Dr. Heitzman will testify as to the other findings in his expert report, a copy of which was previously served on all parties.

b.      Bob L. Gant, Ph.D., ABN, FAPM, FABS, AAPM, FACPN
        Dr. Cartagena (neuropsychology resident)
        Institute for Clinical Neurosciences
        2233 E. Grauwyler Road
        Suite 110
        Irving, Texas 75601
        (972) 570-8200
        *Medical expert*

Dr. Gant will testify as to his review of Plaintiff's produced medical records, including any and/or all healthcare, educational, employment, any or all of the medical/neuro-psychological literature, publications, authoritative texts, articles, studies and any other records or exhibits he has reviewed or may review in the future in support of his opinions, as well as any other records to be produced in this case. He will testify as to his review of the police report, exhibits, photos produced, types of tests and testing results, and as to his neuropsychological examination, observations, findings, and conversations with Plaintiff and his family. His testimony, report and opinions have all been, and/or will be based upon his experience, training, education and upon a reasonable neuro-psychological probability. He will state that he has been and is currently licensed to practice neuro-psychology in Texas, and as to any fields of study or specialization he has

acquired as stated in his resume/cv.  As a result of this accident, Dr. Gant will testify that Plaintiff did not sustain a mild traumatic brain injury (mTBI), or any type of a traumatic brain injury (TBI). The only positive evidence suggesting an impact to the head was a scalp laceration to the frontal-orbital area of his head.  During the first hour after the injury (i.e. the "golden hour"), there was no objective evidence confirming the injury on February 2, 2016 which meets the injury parameter needed to diagnose a mild traumatic brain injury (mTBI).  First responders found Plaintiff alert and oriented x4, and he was ambulatory.  Plaintiff obtained a Glasgow Coma Scale that was 15, or normal, suggesting no changes in his mental status related to a concussion or mTBI.  Plaintiff denied losing consciousness in the accident.  There was no objective evidence of post traumatic amnesia after the accident.

Physical examinations performed by EMS personnel and the ER physician found no focal neurologic deficits or evidence of changes in mental status.  Subsequent records over the next several weeks documented no credible evidence of changes in his cognitive, neurologic, or psychological abilities.  The orthodox view based on decades of neuroscientific research is that neuropsychological symptoms occur immediately post injury, and are worst immediately following the accident, a pattern Plaintiff does not demonstrate.  In summary, there was no medical evidence of a cerebral injury related to a concussion/mTBI.

Dr. Gant will also testify as to what he considers the flaws in the neuropsychological examination of Dr. William Jones.  Dr. Gant considers Dr. Jones' review of medical history inadequate in length and it appears to rely on the patient's accounts and recollections and not the medical records and objective findings in the records.  Dr. Jones' report states that he did not review the EMS or ER records as they were not available.  Dr. Gant also believes it was erroneous to test Plaintiff in English, given that Plaintiff's first language is Spanish.  Finally, Dr. Jones did

not adequately assess symptom validity as required by neuropsychological standards.  Dr. Gant will further testify as to his evaluation of the examination and report conducted by Richard L. Fulbright, Ph.D.  Dr. Gant will respond to the unfounded critical statements by Dr. Fulbright contained in his report.

Dr. Gant will further testify as to the battery of neuropsychological tests he performed on Plaintiff.  Dr. Gant will testify that while Plaintiff failed several tests designed to determine whether or not the patient was giving optimal effort (which is necessary in order to distinguish between poor performance due to brain injury versus poor performance due to low effort), that overall his scores did not demonstrate any brain injury.  Dr. Gant will testify that Plaintiff failed two of five validity checks regarding optimal effort, and that he scored above the cutoff for likely exaggeration or embellishment.  In addition, Plaintiff scored above the cutoff score on all six scales on the Structured Inventory of Malingered Symptomatology (SIMS).  See his report which is incorporated herein.

Dr. Gant will testify that Plaintiff's neurocognitive functioning is within normal limits.  Dr. Gant will testify that Plaintiff demonstrated intact functioning in the domains of language, reasoning, memory, attention, processing speed, and higher cortical functions.  Dr. Gant believes that the relatively poor performance on tests of psychomotor testing was probably secondary to poor effort, and not related to mTBI or concussion.  Dr. Gant will testify as to the other information, observations, history and findings in his expert report, a copy of which was previously produced.

c.      Officer Adam Lawson
        Texas Department of Public Safety
        P.O. Box 4087
        Austin, TX 78773-0001
        512-424-2000
        *Investigating officer*

Officer Lawson will testify as to his observations at the scene of the accident, and his investigation of the scene of the accident, and of the drivers involved in the collision. Officer Lawson will further testify as to his accident report (previously produced) along with all of the conclusions therein.

d.      Corbet Wicks and Custodian of records
        Property Damage Appraisers
        P.O. Box 471909
        Fort Worth, TX 76147
        817-275-5940
        *Property damages appraiser*

Mr. Wicks will testify as to the property damages associated with this case, and in particular his review and analysis of the damages allegedly sustained to Plaintiff's vehicle, along with the cost to repair said damages, and whether any damage was pre-existing or otherwise unrelated to the accident in question.

e.      Interstate reserves the right to call any of Plaintiff's treating medical providers. Plaintiff's treating, referral, referring doctors and all medical providers will testify as to the care and treatment provided to Plaintiff, their examination of Plaintiff, Plaintiff's prior medical history, and all other matters relevant to their diagnosis, care, and treatment of Plaintiff.

**11.    Additional Matters that Would Aid in Resolution**

A ruling on Defendants Motion for Continuance, and if the Court would entertain trying the case Nonjury.

**12.    Estimate of Length of Trial**

**Plaintiff**: 1-1/2 days if tried to the bench; 3 – 4 days if tried to a jury.

**Interstate**: Five days.

**13.     Trial Type**

The case is presently set for Jury Trial, although a request has been made by Plaintiff to try

the case as a Nonjury Trial.

Dated: April 13, 2020

Respectfully Submitted,


BY:   */s/ Darrell G. Adkerson*
DARRELL G. ADKERSON
State Bar No. 00909700
Darrell@ahblaw.net
JEFFREY D. ANTONSON
State Bar No. 24040441
Jeff@ahblaw.net
Adkerson, Hauder, & Bezney, P.C.
1700 Pacific Ave.
Suite 4450
Dallas, Texas  75201-3005
214-740-2500 - Telephone
214-740-2501 - Facsimile

**ATTORNEYS FOR DEFENDANT
INTERSTATE EXPRESS, INC.**

BY:    /s/ W. Kelly Puls           
W. Kelly Puls
State Bar No. 16393350
Kelly@pulshaney.com
Christopher G. Lyster
State Bar No. 12746250

Puls Haney Lyster PLLC
301 Commerce St., Ste. 2900
Fort Worth, Texas 76102
Tel:    817-338-1717
Fax:   817-332-1333

      AND

Todd M. Hurd
State Bar No. 24025443
Todd Hurd & Associates
P.O. Box 1741
Burleson, Texas 76097
t.hurd@texasattorneylaw.com
Tel: (817) 426-4529
Fax: (817) 426-8159

SIGNED this ___day of _____, 2020.


                    _____

HONORABLE JUDGE PRESIDING

## CERTIFICATE OF SERVICE

This is to certify that on this, the 13th day of April 2020, a true and correct copy of the above and foregoing document has been forwarded to the counsel of record, as indicated below:

Christopher G. Lyster
Puls Haney PLLC
301 Commerce Street
Suite 2900
Fort Worth, Texas 76102
*Counsel for Plaintiff*

_____  Via Hand Delivery

_____  Via Certified Mail Return Receipt Requested

_____  Via Facsimile

_____  Via Regular Mail

\_\_\_x\_\_  Via the Court's ECF System


Todd M. Hurd
Todd Hurd & Associates
P.O. Box 1741
Burleson, Texas 76097
*Counsel for Plaintiff*

_____  Via Hand Delivery

_____  Via Certified Mail Return Receipt Requested

_____  Via Facsimile

_____  Via Regular Mail

\_\_\_x\_\_  Via the Court's ECF System



\_\_\_\_/s/ Darrell G. Adkerson_____
DARRELL G. ADKERSON